**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MARY JAPPEN, as Administratrix of
the Estate of Jacquelyn Schnakenberg
and Individually,

               Plaintiff,

         -v-                              1:21-CV-1171 (AJB/PJE)

UNITED STATES OF AMERICA,

               Defendant.[1]

---

**APPEARANCES:**                            **OF COUNSEL:**

MEAGHER & MEAGHER, P.C.        KEITH CLARKE, ESQ.
Attorneys for Plaintiff             MATTHEW MARTIN, ESQ.
111 Church Street
White Plains, NY 10601

HON. JOHN A. SARCONE III      KAREN FOLSTER
Interim United States Attorney for   LESPERANCE, ESQ.
the Northern District of New York
Attorneys for Defendant
445 Broadway, Room 218
Albany, NY 12207

**Hon. Anthony Brindisi, U.S. District Judge:**

<u>**DECISION and ORDER**</u>

I.      **INTRODUCTION**

      This medical malpractice action arises out of the tragic death of 24-year-old Jacquelyn

Schnakenberg ("Ms. Schnakenberg" or "decedent"), who committed suicide just hours after she

---

[1] During discovery, the parties consented to the intervention of HealthAlliance Hospital Mary's Avenue Campus as a defendant in this action. Dkt. No. 33. That entity was later dismissed by stipulation. Dkt. No. 55.

attended her regularly scheduled mental health appointments at the Institute for Family Health ("IFH"), a Federally Qualified Health Center ("FQHC") located in New Paltz, New York.

Plaintiff Mary Jappen ("plaintiff"), as administratrix of her daughter's estate, filed this civil action against defendant United States of America ("defendant") pursuant to the Federal Tort Claims Act ("FTCA").[2]  According to plaintiff's four-count complaint, the mental health providers at IFH failed to properly assess and act upon Ms. Schnakenberg's signs, symptoms, and history of suicidality on July 9, 2019, the date of her untimely death.

On May 2, 2024, defendant moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Dkt. No. 58.  The motion was fully briefed, Dkt. Nos. 66, 74, and the case was reassigned to this Court on January 14, 2025, Dkt. No. 75.  Oral argument was heard by video on February 21, 2025.  Decision was reserved.

## II.    BACKGROUND[3]

In November of 2014, at the age of 19, Ms. Schnakenberg began what would become an on-again, off-again mental health treatment relationship at IFH.  *See generally* Def.'s Facts, Dkt. No. 58-2.

### A.  Mental Health Treatment at IFH

Ms. Schnakenberg's first encounter with the mental health providers at IFH occurred on November 21, 2014.  Def.'s Facts ¶ 1.  There, Ms. Schnakenberg reported to a social worker that she suffered from depression, anxiety, a history of panic attacks, sadness, crying episodes, and

---

[2]  A federal law called the Federally Supported Health Centers Assistance Act extends FTCA malpractice coverage to employees of FQHCs such as IFH.  *Kelley v. Richford Health Ctr., Inc.*, 115 F.4th 132, 136 (2d Cir. 2024).

[3]  These facts are taken from a comparison of the parties' Local Rule 56.1 statements and a review of the underlying medical records.  *Compare* Dkt. No. 58-2, *with* Dkt. No. 68; *see also* Dkt. No. 59.  Because most of the fact disputes identified by plaintiff involve the characterization of statements or other findings in the medical records, those facts have been supported by a direct citation to the record or records in question.  Other disputes identified in plaintiff's responsive filing have been noted.

mood lability. *Id.* ¶ 2; Ex. 1 to Wyre Decl. ("Ex. 1"), Dkt. No. 59-1 at 428.[4] She further

reported that she experienced "really low points" in her mood that occurred before menstruation.

Ex. 1 at 429. Ms. Schnakenberg explained to the social worker that she had been raised by her

mother and maternal grandparents and stated that her mother was sometimes absent from her

life. *Id.*

      Ms. Schnakenberg "adamant[ly] denied being suicidal." Def.'s Facts ¶ 3. But she told

the social worker that she had sent her mother some text messages implying otherwise "just to

get her attention." *Id.* According to Ms. Schnakenberg, a prior therapist had prescribed her an

anti-depression medication called Zoloft, which she had stopped taking, and an anti-anxiety

medication called Xanax, which she still took as needed. Ex. 1 at 430. She further reported that

a therapist had recommended that she attend a voluntary partial hospitalization program called

"BenePartial." *Id.* But it is unclear from the record whether she attended this program. *See id.*

      The social worker observed that Ms. Schnakenberg seemed predominantly depressed and

noted that she was experiencing "some mood changes that [s]eem to be hypomania." Ex. 1 at

428–30; Def.'s Facts ¶ 4. The social worker concluded that Ms. Schnakenberg would be likely

to benefit from therapy and medication management. Ex. 1 at 431. She scheduled a follow-up

appointment for November 25, 2014. Def.'s Facts ¶ 6. But Ms. Schnakenberg no-showed for

this session and was unresponsive to an outreach call. *Id.* Another social worker made contact

with Ms. Schnakenberg in May of 2015 to check in, but she "declined to continue with services

at [that] time." Ex. 1 at 422. Her case was closed effective May 20, 2015. *Id.*

      Ms. Schnakenberg returned to IFH in September of 2016. She attended a primary care

visit on September 8, where she reported to a medical resident that she suffered from anxiety,

---

[4] Pagination corresponds with CM/ECF.

social phobia, and depression.  Ex. 1 at 411.  She denied any suicidal ideation at this visit.  *Id.*

There, she explained to the provider she had recently moved back to the area from Oregon and

wanted to re-establish mental health care in the area.  *Id.*  She reported that, while in Oregon, she

had started taking an anti-depressant medication called Prozac, which she believed had improved

her depression symptoms, and asked for a new Prozac prescription from IFH.  *Id.*

The primary care provider's office scheduled a mental health intake appointment for

October 11, 2016.  Def.'s Facts ¶ 9.  But Ms. Schnakenberg missed this meeting and failed to

show up when it was re-scheduled a week later.  *Id.* ¶ 10.  After a few more days passed, Ms.

Schnakenberg called the primary care provider's office and obtained a refill on her new Prozac

script.  Ex. 1 at 399.  But she was unresponsive to attempts to follow-up with her about the two

mental health appointments that she had missed.  Def.'s Facts ¶ 10.  This mental health referral

was eventually closed in March of 2017.  *Id.*

More than a year passed.  On December 19, 2017, Ms. Schnakenberg presented to urgent

care at IFH with a sinus infection.  Def.'s Facts ¶ 12.  She was crying and anxious.  *Id.* ¶ 13.  She

requested another Prozac prescription and stated that her last script for this anti-depressant

medication had "ran out in September."  *Id.* ¶ 12.  She further reported a "suicide attempt one

year ago" and stated that she had "[t]ried for in patient psych but was sent home."  *Id.* ¶¶ 14–15.

The urgent care provider noted that Ms. Schnakenberg had been treating with a "psych"

professional somewhere other than at IFH.  Ex. 1 at 391 (noting "seeing psych on outside").  The

urgent care provider concluded that Ms. Schnakenberg was "[s]afe with close follow up," refilled

her Prozac prescription, initiated consults with mental health and psychiatry, and left a chart note

that asked psychiatry at IFH to follow-up with her the next day.  *Id.* ¶ 16.  But Ms. Schnakenberg

did not return a voicemail from the nurse who attempted to reach her.  *Id.* ¶ 17.  She called two

weeks later seeking another refill for her Prozac, but was told that she would need to make an appointment with psychiatry in order to do so. *Id*.

On January 18, 2018, Ms. Schnakenberg presented to psychiatry at IFH, where she met with a social worker. Def.'s Facts ¶ 18. There, Ms. Schnakenberg reported her prior diagnoses of anxiety and depression and stated that she was currently experiencing agitation, nervousness or anxiousness, a change in her appetite, flashbacks, feelings of hopelessness, a loss of energy, a labile mood, nightmares, paranoia, difficulty concentrating, sleep disturbances, feelings of social withdrawal and worthlessness, and panic attacks. *Id*. ¶ 19.

Ms. Schnakenberg stated that she had been a victim of domestic violence at the hands of her ex-boyfriend, who was sentenced to prison after giving her a concussion in the presence of multiple witnesses. Def.'s Facts ¶ 21. She further reported that she had engaged in superficial "cutting" for a few weeks and had previously been admitted to the "psych ward for cuts on her arm." *Id*. ¶ 20; Ex. 1 at 381. The social worker noted that Ms. Schnakenberg was still living with her grandparents and that her mother was "in and out of her life." Ex. 1 at 380.

The social worker concluded that Ms. Schnakenberg would benefit from weekly therapy and medication management. Ex. 1 at 382. The provider scheduled a follow-up therapy session for a week later. Def.'s Facts ¶ 23. Ms. Schnakenberg attended that appointment and came to a second one the following week. *Id*. ¶ 24. But she missed a third meeting and was unresponsive to an outreach phone call from IFH in late February of 2018. *Id*. ¶¶ 25–26; Ex. 1 at 362.

On March 27, 2018, Ms. Schnakenberg returned to IFH, where she was seen by a social worker. Def.'s Facts ¶ 28. There, she reported that she was experiencing agitation, nervousness or anxiousness, a depressed mood, feelings of helplessness, a loss of energy, difficulty with concentration, sleep disturbances, social withdrawal, and panic attacks. *Id*. A note in her chart

indicates that Ms. Schnakenberg was "doing well," but states that her symptom improvement had "plateaued" on the current dosage of her anti-depressant medication. *Id*. ¶ 29. The social worker consulted with Ms. Schnakenberg's primary care physician and decided to increase the dosage of her Prozac. *Id*. ¶ 30. The chart note indicates "close follow up within the month" was warranted to monitor this medication change. *Id*.

On April 3, 2018, Ms. Schnakenberg called her primary care doctor's office at IFH and asked to discuss her medication because she was "having panic attacks." Def.'s Facts ¶ 31. She was seen the next day, where she reported that her anxiety had been "out of control for a month and a half now" and that she was suffering from daily panic attacks. *Id*. ¶ 32. The chart note indicates that Ms. Schnakenberg did not express any suicidal thoughts at that time. Ex. 1 at 345. The provider concluded that new medication was warranted to treat Ms. Schnakenberg's anxiety and added a prescription for buspirone, initiated a psychiatric consult referral, and advised her to go to the emergency room if her symptoms worsened. Ex. 1 at 345–46.

Ms. Schnakenberg went to the psychiatric emergency room at Kingston Hospital the next day. Def.'s Facts ¶ 34. The electronic medical records show that Ms. Schnakenberg spent about four hours at the hospital. Ex. 1 at 342. But the parties agree that she was not admitted. Def.'s Facts ¶ 35. The next morning, a social worker from IFH contacted Ms. Schnakenberg to offer her an afternoon appointment with Psychiatric Nurse Practitioner Trissa Adams ("NP Adams"), which she accepted. *See* Def.'s Facts ¶¶ 36–37.

There, Ms. Schnakenberg expressed to NP Adams that she felt "a lot of frustration about getting psychiatric care." Ex. 1 at 334. She reported being "severely depressed and anxious with panic attacks," and endorsed symptoms of depression, anxiety, mania or hypomania, and post-traumatic stress disorder. Def.'s Facts ¶¶ 39–40. She further reported a history of three previous

psychiatric emergency room visits that did not result in admissions. Ex. 1 at 334. She stated that she had attempted to commit suicide "once, via CO2" when she "ran her car in her garage, to end her life," but that her "grandparents came home and interrupted her." *Id*. at 334, 336. According to the chart, Ms. Schnakenberg claimed that she had "never told anyone about this." *Id*.

NP Adams concluded that Ms. Schnakenberg's current level of care was appropriate but noted that she needed to be monitored for "symptoms of [a] mood disorder." Ex. 1 at 337. NP Adams added a new prescription for Ativan, which is used to treat anxiety, and noted that Ms. Schnakenberg had agreed to download a "mood tracking app" to monitor changes in her mood. Def.'s Facts ¶ 41. But Ms. Schnakenberg failed to show up for a counseling session scheduled for less than a week later, on April 11, 2018. *Id*.

On April 12, 2018, Ms. Schnakenberg called 911 and was taken to a local emergency room. Def.'s Facts ¶ 43. The medical record of this visit indicates that she reported "increased depression with feelings of being overwhelmed and a sense of hopelessness over the past week or two." Ex. 1 at 325. She also reported that she had been prescribed Prozac and Ativan, but that she was not taking the Ativan "because she does not feel that it is effective." *Id*.

Ms. Schnakenberg told that emergency room clinician that she had experienced "brief" suicidal ideation in the past week. Ex. 1 at 325. She explained that she could not "elaborate" a plan, but told the clinician "that she grabbed her razor." *Id*. She stated that she was in "weekly" therapy even though she had only attended four session in the past year.[5] Def.'s Facts ¶ 47. Ms. Schnakenberg was kept overnight for observation and discharged the next morning. *Id*. ¶ 44. Thereafter, she failed to show up for her next therapy session on April 18 and canceled another session that had been scheduled for May 7, 2018. *Id*. ¶¶ 49–50.

---

[5] In fact, Ms. Schnakenberg reported that she had been to therapy the previous day even though she had failed to show up for that appointment. Def.'s Facts ¶ 48.

On May 18, 2018, Ms. Schnakenberg met with NP Adams.  Def's Facts ¶¶ 51–52.  She was twenty minutes late for her scheduled appointment due to "transportation issues."  *Id*. ¶ 52.  There, Ms. Schnakenberg reported that she was "depressed," but denied having any "passive or active death wish or suicidal ideation" at that time.  Ex. 1 at 299.  NP Adams noted that Ms. Schnakenberg had "cut her wrists superficially in a suicide gesture" since their last session.  *Id*.  NP Adams prescribed a different anti-depressant, added a medication called Klonopin as needed for anxiety, made a follow-up appointment, and explained to Ms. Schnakenberg that a walk-in clinic was also available on Monday mornings.  Def.'s Facts ¶ 54; Ex. 1 at 300.

Ms. Schnakenberg missed her next three therapy sessions in May, July, and September of 2018, Def.'s Facts ¶ 55, and was unresponsive to outreach efforts from IFH, *id*. ¶ 56.  In October of 2018, IFH transitioned her to "medication management only" due to her lack of response and apparent unwillingness to engage in mental health counseling.  *Id*. ¶ 57.

### B.  Final Months of Treatment

Plaintiff focuses on events beginning on March 1, 2019, when the police brought Ms. Schnakenberg, then 24 years old, to a local emergency room for a psychiatric evaluation.  Ex. 1 at 282; Def.'s Facts ¶ 58.  There, Ms. Schnakenberg reported to the emergency room clinician that she had left her boyfriend's house after getting into an argument.  Ex. 1 at 282.  Afterward, she texted a friend stating "I'm done with all this."  *Id*.  The friend became concerned and called the police, who picked up Ms. Schnakenberg at her grandmother's house.  *Id*.

Ms. Schnakenberg told the emergency room clinician that her "comments were taken out of context and were not made as a threat or thought of suicide," but only "meant she was done with her boyfriend."  Ex. 1 at 282.  She denied "any current suicidal or homicidal ideation."  *Id*.  She also reported that she "was on Prozac and Xanax," but that she "does not like the way the

medications made her feel." *Id*. Ms. Schnakenberg stated that she had "not taken Prozac since last May, but occasionally takes Xanax." *Id*.

The emergency department reviewed Ms. Schnakenberg's medical records, noted that she had come to the emergency room back in April of 2018 for depression and anxiety, and referred her for a behavioral consultation with a psychiatric social worker. Ex. 1 at 284. Soon thereafter, a social worker evaluated Ms. Schnakenberg and confirmed with her grandmother that she had not exhibited any suicidal ideation. *Id*. Ultimately, the emergency room clinician concluded that she was not in any apparent acute distress and ordered her discharged. *Id*. at 282–84.

The hospital notified IFH about Ms. Schnakenberg's emergency room visit. An IFH case manager tried to reach her by phone and by letter on March 6, 2019. Def.'s Facts ¶ 62; Ex. 1 at 279. That outreach did not generate an immediate response, but a few weeks later, on March 26, Ms. Schnakenberg came to IFH for a "crisis intervention" appointment to address a "moderate" episode of her recurrent major depressive disorder and her "suicidal ideation." Def.'s Facts ¶ 63; Ex. 1 at 275. There, Ms. Schnakenberg told a social worker intern that she had not been taking her medication. Ex. 1 at 275. She reported feeling nervous and anxious as well as experiencing a change in her appetite, a depressed mood, and paranoia. *Id*.

The social worker intern assessed Ms. Schnakenberg using a risk assessment tool called the Lifetime/Recent Columbia Suicide Severity Rating Scale ("C-SSRS").[6] Def.'s Facts ¶ 64. There, Ms. Schnakenberg endorsed having thoughts about wishing to be dead and non-specific, active suicidal thoughts (defined by the tool as "[g]eneral, non-specific thoughts of wanting to end one's life/commit suicide . . . without thoughts of ways to kill oneself/associated methods,

---

[6] The C-SSRS is a series of plain-language questions that can be used to help identify whether someone is at risk for suicide, to assess the severity and immediacy of that risk, and to gauge the level of support the person needs. *See Columbia-Suicide Severity Rating Scale (C-SSRS)*, https://www.columbiapsychiatry.org/research-labs/columbia-suicide-severity-rating-scale-c-ssrs (last visited March 9, 2025).

intent, or plan during the assessment period"). Ex. 2 to Wyre Decl. ("Ex. 2"), Dkt. No. 59-2 at

55–56. Ms. Schnakenberg reported experiencing these thoughts both in the past month and over

her lifetime. *Id*.

As to the intensity of these thoughts, Ms. Schnakenberg reported that at the time in her

life when her suicidal ideation was most severe, she experienced these thoughts many times each

day. Ex 2 at 57. In the past month, however, she reported having these thoughts only two to five

times in a week. *Id*. She reported that these thoughts, when she had them over her life or in the

past month, were persistent or continuous and lasted more than eight hours. *Id*. At their most

severe over her lifetime, she reported feeling like she was unable to control these thoughts and

could not stop thinking about killing herself. Def.'s Facts ¶ 68. Over the past month, however,

she reported that she could control the thoughts with some difficulty. *Id*. ¶ 69. Both over her

lifetime and in the past month, she reported that "deterrents" (defined by the tool as "anyone or

anything" that "stopped you from wanting to die or acting on thoughts of committing suicide")

had definitely stopped her from attempting suicide. *Id*. ¶ 70.

When the social work intern questioned her about "active" suicidal ideation with or

without some intent to act, Ms. Schnakenberg reported that over her lifetime she had "pondered

how" and "thought about drowning" and that she had thought about cutting herself, "but

stopped" and "called 911." Ex. 2 at 56. However, Ms. Schnakenberg denied experiencing these

"active" thoughts or making any aborted suicide attempt within the past month.[7] *Id*. at 55–56;

Pl.'s Facts ¶ 72 (noting that C-SSRS tool recorded lifetime history of an aborted attempt).

---

[7] Plaintiff contends that the social work intern failed to "document the lifetime or recent frequency" of the "most severe ideation" decedent reported experiencing over her lifetime; *i.e.*, the ideation where she "considered drowing [*sic*] herself." Pl.'s Facts, Dkt. No. 68 ¶ 66.

The social work intern's clinical summary of Ms. Schnakenberg's responses to the C-SSRS identified several risk factors, including her neglectful mother and abusive ex-boyfriend. Ex. 2 at 60. Although this summary concluded that she was "not impulsive," the record notes that Ms. Schnakenberg had been experiencing fluctuating, "[p]assive suicidal ideation" since 2009. *Id.* This clinical summary also identified several positive or protective factors as well, such as the fact that Ms. Schnakenberg "can thoroughly rely on her grandparents, although they don't understand mental illness in the slightest form." *Id.*; Pl.'s Facts ¶ 73.

The social work intern characterized Ms. Schnakenberg's responses and risk factors as placing her at a "higher" risk of suicide than other 24-year-old females but at a "similar" risk to her own baseline. Ex. 2 at 60. Based on her responses to the C-SSRS, the intern engaged Ms. Schnakenberg in developing a safety plan, which helped her identify the warning signs that a crisis may be developing, the coping strategies she can use, the people and social situations that distract her, the people that she can ask for help, the professionals she can contact during a crisis, and the things that are worth living for and that are most important to her. *Id.* at 61.

The social work intern planned to continue to monitor and assess Ms. Schnakenberg for suicidal ideation and to conduct a psychosocial evaluation at her next therapy session, which was scheduled for April 2. Ex. 1 at 275. But Ms. Schnakenberg canceled that appointment. Def.'s Facts ¶ 76. She rescheduled it for April 4, where she was seen by the same social work intern who conducted the initial C-SSRS. *Id.* ¶ 77.

At this session, Ms. Schnakenberg reported feeling nervousness, anxiousness, a depressed mood, paranoia, and difficulty concentrating. Ex. 1 at 264. She reported experiencing these symptoms "daily" on a "moderate" basis. *Id.* She further reported being "concerned about her ex" and being stressed about work and finances "and her inevitable move to live with her aunt

and uncle." *Id*. at 263–64.  Although she stated that she still lived with her grandparents, Ms. Schnakenberg explained that they "will be selling their house" and she would be "going to her aunt and uncle's house." *Id*. at 264.

The social work intern re-administered the C-SSRS using a set of questions that focused on whether there were any changes since the last visit.  Def.'s Facts ¶ 84; Ex. 2 at 48–55.  The intern also reviewed Ms. Schnakenberg's safety plan with her.  *Id*.  The clinical summary from the C-SSRS characterized Ms. Schnakenberg's current risk status and level as similar to her own baseline and to other women her age.  Ex. 2 at 53.  The summary noted that Ms. Schnakenberg denied experiencing any current suicidal ideation, intent, or plan.  Ex. 1 at 267.

The social worker intern concluded that Ms. Schnakenberg "would likely benefit from cognitive behavioral therapy and medication management to alleviate symptoms" of anxiety and depression.  Ex. 1 at 267.  The intern scheduled a follow-up appointment for April 16.  *Id*.  Later that day, a note was added to Ms. Schnakenberg's chart which stated in relevant part: "[p]atient is requesting a form to be filled out for a partial program she will be attending.  The form is in your mail bin for completion." *Id*. at 256.

Because this referral form was blank except for Ms. Schnakenberg's name, address, and date of birth, the social work intern contacted someone at "Health Alliance Hospital," the entity that administered the partial hospitalization program, and obtained some information about the referral requirements.  Def.'s Facts ¶ 91.  Afterward, the intern called Ms. Schnakenberg to tell her what information she would need to bring to her next appointment.  *Id*. ¶ 92.

Ms. Schnakenberg canceled her next appointment at IFH.  Ex. 3 to Wyre Decl. ("Ex. 3"), Dkt. No. 59-3 at 1.  But she was seen for medication management by NP Adams on April 12,

2019. Ex. 1 at 248–49.[8]  There, Ms. Schnakenberg reported that she had "been struggling with anxiety and depression" that had gotten "so bad that she dropped out of school and has not been able to tell either the school or her parents." *Id*. at 249.  According to a chart notation by NP Adams, Ms. Schnakenberg had not been seen in psychiatry since May of 2018. Ex. 1 at 249.

NP Adams noted that Ms. Schnakenberg still planned to go to the partial hospitalization program at Health Alliance and that her therapist was working to complete the referral. Ex. 1 at 250.  NP Adams also noted that Ms. Schnakenberg had not been compliant with her medication. *Id*. at 250.  NP Adams administered the C-SSRS, reviewed Ms. Schnakenberg's safety plan with her, observed that she denied "any thoughts of self harm or of ending her life," ordered her some new medications, and scheduled a follow-up visit in two weeks. Ex. 2 at 38–43; Ex. 1 at 251.

On April 16, 2019, Ms. Schnakenberg attended a counseling session with the social work intern. Def.'s Facts ¶ 99.  There, she reported feeling agitated, nervous and anxious, a depressed mood, a change in appetite, feelings of hopelessness, paranoia, difficulty with concentration, and sleep disturbances. Ex. 1 at 242.  Ms. Schnakenberg further reported being "100% complian[t]" with her medication regimen. *Id*.  Likewise, she "continue[d] to deny suicidal ideation," reported "no plan, method, or intent," and claimed that "there has been no ideation since the initial crisis intervention session." *Id*. at 242–43.  The social work intern administered the C-SSRS and reviewed Ms. Schnakenberg's safety plan with her.  Def.'s Facts ¶ 101.

The intern also obtained from Ms. Schnakenberg the documents and signatures needed to complete her partial hospitalization program referral form.  Def.'s Facts ¶ 103.  The intern faxed the completed form to Health Alliance on April 18, 2019.  *Id*.  Thereafter, the provider attempted

---

[8] Plaintiff denies that the stated purpose of this visit was for "medication management."  Pl.'s Facts ¶ 94.  But the record of this visit states it twice.  Ex. 1 at 248 (listing "reason for visit" as "medication management"); *id*. at 249 ("Patient presents for psychiatric medication management . . . .").

to contact Ms. Schnakenberg by telephone on April 22, May 10, and May 17, 2019, but she did not answer the calls and her voice mailbox was full.  *Id*. ¶¶ 104–05.

On April 24, 2019, Ms. Schnakenberg went to IFH, where she was seen by NP Adams for medication management.  Def.'s Facts ¶ 108.  There, Ms. Schnakenberg reported having trouble sleeping, "one really bad day with depression," and stated that she "was unable to function that day."  Ex. 1 at 237.  NP Adams administered the C-SSRS, where Ms. Schnakenberg endorsed having thoughts of wishing to be dead and non-specific active suicidal thoughts "once between sessions."  Def.'s Facts ¶ 111; Ex. 2 at 21.  But Ms. Schnakenberg denied any method, plan, or intent to commit suicide.  Ex. 2 at 21.

NP Adams engaged in safety planning with Ms. Schnakenberg, increased the dosage of her anti-depressant, and added a new prescription for mirtazapine to help her sleep.  Def.'s Facts ¶¶ 110, 112.  Ms. Schnakenberg reported that she still planned to go to the partial hospitalization program at Health Alliance.  *Id*. ¶ 113.  NP Adams noted that the referral for this program had been submitted for Ms. Schnakenberg by IFH.  *Id*. ¶ 114.  But Ms. Schnakenberg no-showed for her counseling session scheduled for the next day, April 25, and was unresponsive to attempts to reschedule it.  *Id*. ¶¶ 115–16.

On May 6, 2019, Ms. Schnakenberg called IFH seeking to refill her prescriptions.  Ex. 1 at 230.  The IFH representative reminded her that "regular follow up [was] recommended," but Ms. Schnakenberg "refused to schedule future appointment[s]."  *Id*.  A record of this encounter notes that Ms. Schnakenberg had two appointments scheduled for May 14 and May 16.  *Id*.

Ms. Schnakenberg no-showed for the May 14 therapy session and did not answer a phone call from the social work intern who tried to contact her.  Def.'s Facts ¶ 118; Ex. 1 at 228.  The intern managed to make contact with Ms. Schnakenberg's grandmother, who reported that her

granddaughter was not home at the time. Ex. 1 at 228. The intern followed up with a letter that informed Ms. Schnakenberg that the social worker's internship was about to end. *Id*. This letter included a list of other mental health resources in the area in case Ms. Schnakenberg decided to pursue more therapy or treatment. *Id*.

On May 16, 2019, Ms. Schnakenberg went to IFH, where she was seen by NP Adams for medication management. Def.'s Facts ¶ 121. There, Ms. Schnakenberg reported she was "doing good," waking up in a better mood, and able to "step back" more when she has strong emotions. Ex. 1 at 23. She further reported that she was still having panic attacks and experienced fear of leaving her home. *Id*. She explained that her ex-boyfriend was about to be released from jail and stated that she had been "having nightmares about him" and "ruminating about him and their relationship." *Id*. However, Ms. Schnakenberg denied experiencing any suicidal ideation, which this medical record characterized as "unusual for her." Ex. 1 at 223.

NP Adams administered the C-SSRS, noted that Ms. Schnakenberg's current risk status was similar to "baseline," and engaged in safety planning with her. Def.'s Facts ¶ 123; Ex. 2 at 16. NP Adams noted that Ms. Schnakenberg had been compliant with her medication, observed that it had been "helpful thus far," and increased the dosage of her anti-depressant. Ex. 1 at 224–25. NP Adams scheduled a follow-up for "1 month or sooner if needed." *Id*. at 225.

On May 21, 2019, Licensed Master Social Worker Alison Krause ("LMSW Krause"), who had been supervising the intern assigned to Ms. Schnakenberg, took over the case file and had a "case conference" with NP Adams to discuss a treatment plan. Def.'s Facts ¶ 126. There, LMSW Krause informed NP Adams that Ms. Schnakenberg had missed her last two therapy appointments and had been unresponsive to IFH's outreach. Ex. 1 at 219–20. At this meeting, NP Adams explained to LMSW Krause that she believed Ms. Schnakenberg still "wants to

engage in therapy and is also [still] interested in the partial hospitalization program" at Health Alliance. *See id*. at 220.

On June 7, 2019, LMSW Krause left a voicemail for Ms. Schnakenberg seeking to talk to her about the plan for her care. Ex. 1 at 218. A few days later, on June 10, Ms. Schnakenberg called back, reporting to LMSW Krause that she was "struggling" due to "current situational stressors." *Id*. at 216. LMSW Krause offered her a "crisis appointment" for Wednesday of that week, which Ms. Schnakenberg accepted. *Id*.

On June 12, 2019, Ms. Schnakenberg went to IFH for this "crisis appointment," where she was seen by LMSW Krause. Def.'s Facts ¶ 133. Although LMSW Krause had supervised the social work intern who had been assigned to Ms. Schnakenberg, this meeting was their first session together. *Id*. ¶ 134; Ex. 1 at 211. Ms. Schnakenberg reported agitation, nervousness or anxiousness, a depressed mood, feelings of helplessness, and difficulty with concentration. Ex. 1 at 211. She also reported "100% compliance" with her medication regimen in the past week. *Id*.

LMSW Krause administered the C-SSRS, noted that Ms. Schnakenberg's current risk status was higher than baseline, and engaged in safety planning with her. Def.'s Facts ¶ 136; Ex. 2 at 10. LMSW Krause noted that Ms. Schnakenberg was "engaged" and "expressed interest in continued therapy." Ex. 1 at 212. LMSW Krause noted that the plan was for Ms. Schnakenberg to continue medication management. *Id*. Her next therapy session was set for July 9, 2019. *Id*.

**C. July 9, 2019 Treatment at IFH**

On July 9, 2019, Ms. Schnakenberg went to IFH, where she was seen by LMSW Krause for a forty-five-minute psychotherapy session. Def.'s Facts ¶ 139. There, Ms. Schnakenberg reported agitation, nervousness or anxiousness, a depressed mood, feelings of helplessness, loss of energy, anxiety, and panic attacks. Ex. 1 at 207. LMSW Krause observed that she appeared

"disheveled" and that her mood was "anxious, depressed[,] and irritable." Ex. 1 at 207. LMSW Krause noted that Ms. Schnakenberg was experiencing active suicidal ideation. *Id.* The record from this therapy visit states that Ms. Schnakenberg "is a risk of [losing] housing," because she was "living with her grandparents and they do not want her to stay." *Id.* at 209. This record also notes that Ms. Schnakenberg was "interested in learning more about the application process for temporary assistance and possible SSI." *Id.*

LMSW Krause administered the C-SSRS, where Ms. Schnakenberg endorsed thoughts of wishing to be dead as well as non-specific active suicidal thoughts. Ex. 2 at 6. When asked to describe these active suicidal thoughts, Ms. Schnakenberg "report[ed] thoughts that she wants to be dead, has thought 'maybe I should just kill myself.'" *Id.* at 7. However, when asked whether she had been thinking of how to commit suicide, whether these thoughts were accompanied by some intent to act on them, or whether she had started to work out the details of how she might kill herself, the C-SSRS evaluation shows that Ms. Schnakenberg responded "no." *Id.* at 6.

Ms. Schnakenberg reported to LMSW Krause that she had not received a call from the partial hospitalization program yet. Ex. 1 at 208. LMSW Krause called the program's office manager, who explained that the referral had been received but that Ms. Schnakenberg had been unresponsive to "several outreach calls." *Id.* Because Ms. Schnakenberg "voiced [a] desire to enroll," LMSW Krause completed and submitted a new application on her behalf. *Id.* LMSW Krause noted that Ms. Schnakenberg "may need assistance in follow up to coordinate care." *Id.* at 208. LMSW Krause engaged in safety planning with her. Def.'s Facts ¶ 141. According to LMSW Krause, Ms. Schnakenberg was grateful for the support, seemed relieved to have a plan, and was excited to engage in a higher level of care. *Id.* ¶ 151.

After this therapy session ended, Ms. Schnakenberg met with NP Adams for medication management.  Def.'s Facts ¶ 153.  There, Ms. Schnakenberg reported being "currently depressed and anxious, irritable, [and] having angry outbursts."  Ex. 1 at 198.  She stated "I'm [losing] my shit" and "not doing what I need to do."  *Id*. at 196.  In apparent contrast to her report to LMSW Krause, Ms. Schnakenberg reported to NP Adams that she had run out of her prescription anti-depressant two weeks ago.  *Id*.  This record also notes that her "[h]ousing is insecure."  *Id*.

NP Adams did not administer the C-SSRS, which LMSW Krause had already completed earlier that day.  Def.'s Facts ¶ 157.  But NP Adams did discuss Ms. Schnakenberg's safety plan with her.  *Id*. ¶ 158.  NP Adams also administered the patient health questionnaire-9 ("PHQ-9") and general anxiety disorder-7 ("GAD-7"), which are screening tools used to assess the severity of a patient's depression and anxiety.  Ex. 1 at 196.  According to plaintiff, Ms. Schnakenberg's responses to these tools were in the critical or emergency range, which is emphasized by the two exclamation marks recorded in the chart.  *Id*. at 196–97.  In plaintiff's view, it is significant that in response to item nine of the PHQ-9, which asks about how often over the past two weeks the patient has been bothered by thoughts that she would be better off dead or hurting herself in some way, Ms. Schnakenberg responded "[n]early every day."  *Id*. at 197.

Based on her observations and knowledge of Ms. Schnakenberg's history, NP Adams diagnosed Ms. Schnakenberg with bipolar II disorder.  *Id*. ¶¶ 160–63.  NP Adams refilled Ms. Schnakenberg's anti-depressant and prescribed her a new medication called Abilify, which acts as a mood stabilizer.  *Id*. ¶¶ 163, 165.  According to NP Adams, the Abilify was "not likely to stabilize her mood immediately . . . [but it] would [have] start[ed] helping within the week" if she had taken it as prescribed.  Pl.'s Facts ¶ 164.

NP Adams did not discuss, consider, or recommend hospitalization because she did not believe that Ms. Schnakenberg met the criteria for inpatient admission. Adams Decl., Dkt. No. 58-4 ¶¶ 12, 21. Instead, in addition to the medications, NP Adams provided Ms. Schnakenberg with support, encouragement, and psychoeducation. Def.'s Facts ¶ 166. According to NP Adams, Ms. Schnakenberg appeared to be relieved to have some clarity in terms of her diagnosis and treatment plan. *Id*. ¶ 169. NP Adams felt assured that Ms. Schnakenberg "did not have a plan to kill herself or the intent to do so." Adams Decl. ¶ 11. Ms. Schnakenberg left IFH around 2:00 p.m. that day. *See* Ex. 3 at 1 (noting thirty-minute appointment with NP Adams for 1:30p).

### D. Ms. Schnakenberg's Death

At approximately 5:49 p.m. that afternoon, the Kingston Police Department received a report of a female found unresponsive by her boyfriend. Def.'s Facts ¶ 172. Despite CPR and other lifesaving measures, Ms. Schnakenberg was pronounced dead at Kingston Hospital about an hour later. *Id*. ¶ 173. Police interviewed decedent's boyfriend, who stated he had discovered cuts on her right upper thigh the day before. *Id*. ¶¶ 174–75. He explained that he had wanted to report the incident, but decedent "persuaded him not to because if he did she could have end[ed] up in the psych ward." *Id*. ¶ 176.

## III.  LEGAL STANDARD

The entry of summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In conducting this analysis, the court must view

the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Id.* at 255. But there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## IV.    DISCUSSION

Plaintiff asserts claims for medical malpractice (Count One), lack of informed consent (Count Two), loss of services (Count Three), and wrongful death (Count Four) pursuant to the FTCA, which "grants district courts jurisdiction over tort suits against the United States for the negligent acts of federal employees acting in the scope of their employment." *Corley v. United States*, 11 F.4th 79, 84 (2d Cir. 2021) (cleaned up). "[T]he FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees," *Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012), and the parties agree that New York's substantive tort law governs this dispute, *see* Dkt. No. 58-1 at 18; Dkt. No. 66 at 11.

### A.  Medical Malpractice

Plaintiff's claim for medical malpractice is based on LMSW Krause's and NP Adams's alleged failure to properly assess decedent, identify her imminent suicidality, and appropriately intervene to prevent her death on July 9, 2019.[9] According to plaintiff, these providers should have recognized that the standard of care under the circumstances required an "immediate and consequential intervention," which in plaintiff's view meant decedent's same-day admission to a voluntary inpatient hospitalization program or perhaps even her involuntary hospitalization.

---

[9] Although the complaint alleged other acts of negligence and identified other providers, at oral argument plaintiff confirmed that her medical malpractice claim is based on the treatment decedent received from LMSW Krause and NP Adams on July 9, 2019. Accordingly, any claims arising from treatment by Bridget Foy, Margaret Gunther, or Holland Troegger are dismissed.

Defendant argues that it is entitled to summary judgment on this claim because the record establishes that LMSW Krause and NP Adams appropriately evaluated decedent on July 9, 2019, the date of her final visit to IFH.  Defendant contends that both providers exercised good clinical judgment in determining that she was safe, that she did not meet the criteria for inpatient hospital admission, and that a referral to a higher level of care; *i.e.*, the voluntary partial hospitalization program at Health Alliance, was an appropriate intervention based on her clinical presentation.

"To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994) (citations omitted).  "New York law further provides that, except as to matters within the ordinary experience and knowledge of laymen, . . . expert medical opinion evidence is required to make out both of these elements." *Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (cleaned up).

### 1. Standard of Care

"A doctor is charged with the duty to exercise due care, as measured against the conduct of his or her own peers—the reasonably prudent doctor standard." *Nestorowich v. Ricotta*, 97 N.Y. 2d 393, 398 (N.Y. 2002); *Spensieri v. Lasky*, 94 N.Y.2d 231, 238 (N.Y. 1999) ("[T]he standard of care for a physician is one established by the profession itself.").  In the context of an unprevented suicide, New York courts have held that a mental health professional with sufficient expertise to detect suicidal tendencies and with the control necessary to care for a decedent's well-being can be held liable if the provider failed to take reasonable steps to prevent a reasonably foreseeable suicide. *See Cygan v. City of N.Y.*, 165 A.D.2d 58, 67 (1st Dep't 1991).

However, "[a] doctor is not liable in negligence merely because a treatment, which the doctor as a matter of professional judgment elected to pursue, proves ineffective or a diagnosis proves inaccurate." *Nestorowich*, 97 N.Y.2d at 398. In New York, this general principle is often referred to as the "doctrine of professional medical judgment" or sometimes just the "medical judgment rule." *Park v. Kovachevich*, 982 N.Y.S.2d 75, 81 (1st Dep't 2014) (cleaned up). It is "particularly relevant to cases involving mental health treatment, given that psychiatry is not an exact science and, therefore, decisions related to mental health treatment and discharge often involve a measure of calculated risk." *Gallagher v. Cayuga Med. Ctr.*, 151 A.D.3d 1349, 1351 (3d Dep't 2017) (citations omitted).

This doctrine insulates from liability a mental health provider who "chooses a course of treatment, within a range of medically accepted choices, for a patient after a proper examination and evaluation." *Park*, 982 N.Y.S.2d at 81 (citations omitted). Thus, "for a psychiatrist to be held liable for malpractice based upon a decision made in connection with a patient's treatment or a decision to discharge a patient from a hospital, it must be shown that the treatment decisions represented something less than a professional medical determination or that the psychiatrist's decisions were not the product of a careful evaluation." *Gallagher*, 151 A.D.3d at 1351 (cleaned up).

Measured against this general body of law, defendant's motion for summary judgment must be granted. As an initial matter, defendant's submissions establish that LMSW Krause and NP Adams provided decedent with mental health treatment on July 9, 2019, that was well within the range of medically acceptable choices after each provider examined and evaluated decedent's clinical presentation. Def.'s Reply, Dkt. No. 74 at 3 (summarizing admitted facts regarding decedent's care and treatment on July 9, 2019).

Among other things, the undisputed facts establish that LMSW Krause and/or NP Adams engaged decedent in a psychotherapy session, reviewed her safety plan with her, and re-started certain medications that decedent had reported as effective for her symptoms before she had run out of them.  The undisputed facts further establish that NP Adams added a mood stabilizer to address decedent's reports of mood swings and that LMSW Krause referred decedent to a higher level of care by completing and re-submitting the referral paperwork for the voluntary partial hospitalization program at Health Alliance Hospital.

Plaintiff has not identified sufficient evidence to raise a triable issue of fact as to whether this *prima facie* showing departed from the standard of care.  In fact, as defendant points out, Dr. Glenn Kalash, plaintiff's expert witness, acknowledged in his deposition that these interventions would be acceptable for a patient who, like decedent, presented with active suicidal ideation but without a plan or specific intent to act on those thoughts.  Ex. G to Lesperance Decl. ("Kalash Dep."), Dkt. No. 58-21 at 13–14 (voluntary partial hospitalization program can be effective to address suicidal ideation), 21 (voluntary inpatient program would be an appropriate intermediate step before involuntary commitment), 23 (decedent's clinical presentation would likely not have justified involuntary hospitalization), 37–39 (safety planning and voluntary inpatient program can be used to mitigate risk of suicide).

Plaintiff attempts to avoid this straightforward conclusion by suggesting that one or both providers engaged in a less-than-careful evaluation of decedent on July 9, 2019.  For instance, plaintiff argues that LMSW Krause's testimony indicates that she might have overlooked the fact that decedent had reported a prior aborted suicide attempt to another provider.  Pl.'s Opp'n, Dkt. No. 66 at 12–13 (arguing Krause "makes no attempt to explain how she could have adequately assessed [decedent's] risk factors" if she "failed to appreciate" the prior documented attempt).

This argument must be rejected. As defendant explains, viewed in context this testimony tends to show that LMSW Krause in fact reviewed the relevant medical records. Def.'s Reply at 6. But even crediting plaintiff's argument and assuming otherwise for purposes of summary judgment, this dispute is not sufficient to raise a triable issue of fact as to whether LMSW Krause deviated from the accepted standard of care on July 9, 2019. Even if Krause were unaware that decedent had reported an aborted attempt (more than a year earlier), the record evidence shows that Krause appropriately assessed that decedent was "in crisis" and experiencing active suicidal ideation on July 9, 2019, but that decedent had denied a plan or intent to act on those thoughts. Plaintiff has offered no basis on which a reasonable fact-finder could conclude that the standard of care for an outpatient who presents with active suicidal ideation but without a plan or intent to act must be hospitalized if they have a prior aborted suicide attempt in their medical history.

Indeed, although Dr. Kalash opined that involuntary hospitalization might be warranted in certain circumstances, and might have been warranted if decedent had refused to participate in a voluntary program, he conceded in his deposition that it would be "too speculative" for him to conclude that it would have been the appropriate intervention on July 9, 2019. *Compare* Ex. A to Kalash Decl. ("Kalash Report") Dkt. No. 66-6 at 14 (opining that if "the patient declines the first treatment option but continues to exhibit a concerning level of suicidality, the provider should promptly discuss involuntary commitment with the patient's fellow providers and, if necessary, pursue this second option"), *with* Kalash Dep. at 27 (testifying that it was "too speculative" to say that the "standard of care required an involuntary hospitalization").

Likewise, although Dr. Kalash repeatedly suggested that LMSW Krause and NP Adams might have misunderstood or mischaracterized certain risk factors during their respective exams, in his deposition he was unable to identify any particular factor or set of factors that, if properly

understood or properly characterized, would have justified involuntary hospitalization or some other intervention that was more significant than the treatment decedent received.[10]  Kalash Dep. at 28–32.  Courts, including the Second Circuit, have concluded that this kind of generalized or conclusory speculation by a plaintiff's expert is insufficient to defeat summary judgment in cases based on an unprevented suicide.

For example, in *Valdes v. Brooks*, the decedent received mental health treatment for his severe depression from two different providers: a psychiatrist and a clinic.  2023 WL 309611, at *1 (2d Cir. Jan. 19, 2023).  During a clinic session a few days before his death, the decedent reported that he had been experiencing suicidal ideation.  *Id*.  However, the decedent denied having a plan or method to act and the clinician felt "convinced" that the decedent "was not in imminent danger of any self-harm."  *Id*.  Neither the decedent nor the clinician reported these events to the decedent's psychiatrist.  *Id*.  The decedent committed suicide two days later.  *Id*.

The decedent's wife brought a New York medical malpractice action based on, *inter alia*, the defendant-clinician's alleged failure to "communicate and coordinate his treatment" with the decedent's psychiatrist.  *Id*.  But the trial court granted summary judgment to the clinician, reasoning that the plaintiff's expert opinion was too speculative to establish a *prima facie* malpractice claim.  *Id*.

The plaintiff appealed but the Second Circuit affirmed.  In so doing, the *Valdes* panel explained that although the plaintiff's expert had initially claimed that "coordination of care" between the decedent's providers "could have possibly changed the outcome," he later conceded

---

[10]  Elsewhere, plaintiff makes similar arguments with respect to decedent's reports of unstable housing and whether LMSW Krause should have used certain screening assessments.  But as defendant points out, the record establishes that both providers considered decedent's housing situation and NP Adams performed the screening assessments in question.  Def.'s Reply at 10.  Absent more, neither argument provides a basis on which to deny summary judgment.

in his deposition that it was "unknowable" whether "communication between the two doctors

would have resulted in a 'different outcome.'" *Id*.

With involuntary hospitalization off the table, the core of plaintiff's medical malpractice

claim is her assertion that one or both providers deviated from the standard of care because they

failed to recommend to decedent that she consider Four Winds, a same-day voluntary inpatient

treatment program. Pl.'s Opp'n at 13–14 (citing to NP Adams's testimony that a referral to Four

Winds was "indicated" in "a lot of individual cases"); Kalash Dep. at 24 ("That's what I would

say would be the immediate intervention that is opening up a discussion inclusive of the least

restrictive alternative at that point. Again, that would have been I think a point of standard of

care.").

This argument does not give rise to a triable issue of fact, either. Unlike a voluntary

partial hospitalization program such as Health Alliance that requires a provider's referral, Four

Winds is a different kind of voluntary program that requires the patient to initiate contact and

arrange for admission. Def.'s Reply at 8 (quoting NP Adams's testimony). In other words,

plaintiff's argument is that LMSW Krause or NP Adams deviated from the standard of care on

July 9, 2019, because they should have discussed Four Winds and encouraged decedent to check

herself in to *that* voluntary program instead of submitting the referral to Health Alliance, the

voluntary program in which she had previously expressed interest. But this is exactly the kind of

second-guessing that "without more, represents, at most, a difference of opinion among [medical

providers], which is not sufficient to sustain a *prima facie* case of malpractice." *Park*, 116

A.D.3d at 190 (cleaned up). Accordingly, defendant is entitled to summary judgment on

plaintiff's medical malpractice claim.

## 2. Proximate Cause

Even assuming plaintiff could otherwise show a triable issue of fact as to whether one or both providers deviated from the accepted standard of care on July 9, 2019, there is no evidence from which to reasonably conclude that the deviation was a proximate cause of decedent's death by suicide. Briefly stated, proximate cause requires that the injury be a "reasonably foreseeable result of the negligence." *LaMarca v. United States*, 31 F. Supp. 2d 110, 127 (E.D.N.Y. 1998) (cleaned up); *see also Nieves v. City of N.Y.*, 91 A.D.2d 938, 939 (1st Dep't 1983) (requiring a showing of proximate causation based on something more than expert's "mere speculation").

Plaintiff has not identified facts in the record that would support this showing. As with the standard-of-care element of her claim, proximate causation must be supported with expert medical testimony. *See, e.g.*, *Hegger v. Green*, 646 F.2d 22, 28 (2d Cir. 1981). As discussed *supra*, Dr. Kalash's opinion on this point is that decedent would not have committed suicide if her providers had "discussed" voluntary hospitalization programs with her. Kalash Dep. at 24.

But as just explained, the only program that plaintiff's expert witness identified is Four Winds, a voluntary inpatient program that does not rely on a provider's referral. In other words, Dr. Kalash's causation opinion requires a series of additional assumptions: decedent would have agreed to this course of voluntary treatment, contacted the facility that very day, traveled there herself, chosen to be admitted, and stayed long enough to engage in sufficient treatment that would have prevented her suicide.

Courts have repeatedly rejected this kind of expert causation testimony as too speculative to warrant a fact-finder's involvement. *Valdes*, 2023 WL 309611, at *3 (affirming summary judgment where plaintiff's expert opined that decedent's providers should have coordinated better but conceded that it was "unknowable" whether this would have resulted in a "different

outcome"); *Morillo v. N.Y. City Health & Hosps. Corp.*, 166 A.D. 3d 158, 159 (1st Dep't 2018) (rejecting as "speculative" plaintiff's expert's opinion that decision to discharge him led to his suicide two days later); *Nieves*, 91 A.D.2d at 939 (vacating plaintiff's verdict because expert's testimony on proximate causation "was based on mere speculation").

That is especially so where, as here, the unrebutted evidence establishes that decedent did *not* have a plan or intent to die by suicide, at least as of the time of her last visit to IFH on July 9, 2019. Although she was experiencing active suicidal ideation, decedent stated to LMSW Krause that she did not have a plan or intent at that time and both providers observed a positive change in her demeanor during the course of her visit. Based on their respective examinations, both providers testified that decedent would not have been a candidate for hospitalization and would likely not have been admitted if she had gone to the hospital at that time.

Notably, rather than point to some overlooked data point, Dr. Kalash acknowledged that he had no way of knowing whether decedent had a plan and intent to commit suicide as of the time of her visit to IFH on July 9, 2019, either. Kalash Dep. at 36 ("I mean, you know, your speculation that she didn't [have a plan], could - - is countered by my speculation that she did. Again, we're speculating, you know, equally."). Accordingly, defendant is entitled to summary judgment on plaintiff's medical malpractice claim.

## B. Plaintiff's Remaining Claims

Plaintiff also alleged claims for lack of informed consent (Count Two), loss of services (Count Three), and wrongful death (Count Four). These claims must be dismissed. As to Count Two, plaintiff agreed to withdraw this claim at oral argument:

> THE COURT: [M]y first issue is for Mr. Martin. Are you withdrawing the informed consent cause of action?
>
> MR. MARTIN: Yes, Judge.

As to Counts Three and Four, these claims relied on the viability of plaintiff's claim for medical malpractice.  Because defendant is entitled to summary judgment on that claim, these derivative claims must be dismissed as well.  *See, e.g.*, *Wijesinghe v. Buena Vida Corp.*, 178 N.Y.S.3d 184, 187 (2d Dep't 2022) ("Dismissal of the direct claim of medical malpractice mandates dismissal of the derivative causes of action."); *Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 367 (S.D.N.Y. 2009) (dismissing New York wrongful death cause of action where primary tort claim failed); *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 585 (S.D.N.Y. 2008) (collecting cases dismissing New York loss-of-services claims as derivative of claim for child's injury).

## V.    CONCLUSION

"[T]he line between medical judgment and deviation from good medical practice is not easy to draw."  *Park*, 116 A.D.3d at 191.  But even the most effective mental health providers must operate in an environment that requires calculated risk.  *Seibert v. Fink*, 280 A.D.2d 661, 661 (2d Dep't 2001) ("A psychiatrist is not required to achieve success in every case.").  The facts of this case, even when viewed in the light most favorable to the non-movant, could not lead a rational fact-finder to return a plaintiff's verdict.

Therefore, it is

ORDERED that

1.  Defendant's motion for summary judgment (Dkt. No. 58) is GRANTED;

2.  Defendant's request for attorney's fees (Dkt. No. 69) is DENIED[11]; and

---

[11]  After defendant filed its reply, Dkt. No. 67, plaintiff realized she had failed to oppose movant's statement of material facts.  She sought leave to file a late response, Dkt. No. 68, which defendant opposed as prejudicial, Dkt. No. 69.  Defendant argued that an award of attorney's fees for extra time spent drafting an amended reply would be warranted if the Court decided to let plaintiff file a late response.  *Id*.  Judge Suddaby granted plaintiff leave to file a late response but reserved decision on the fee request.  Dkt. No. 70.  Thereafter, defendant sought roughly $3,300 for 9.5 hours of attorney time.  Dkt. Nos. 74-1 (attorney declaration), 74-2 (attorney time log).

3.  Plaintiff's complaint (Dkt. No. 1) is DISMISSED with prejudice.

The Clerk of the Court is directed to terminate the pending motion, enter a judgment accordingly, and close the file.

**IT IS SO ORDERED.**

Dated:  March 21, 2025
       Utica, New York.

Anthony J. Brindisi
U.S. District Judge